UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>(1) CEDRIC CROMWELL and<br>(2) DAVID DEQUATTRO,<br><br>Defendants | Criminal No.   20cr10271<br><br>Violations:<br><br>Count One: Conspiracy to Commit Federal<br>Programs Bribery<br>(18 U.S.C. § 371)<br><br>Counts Two-Three: Bribery Concerning<br>Programs Receiving Federal Funds;<br>Aiding and Abetting<br>(18 U.S.C. § 666(a)(1)(B); 18 U.S.C. § 2)<br><br>Counts Four-Five: Bribery Concerning Programs<br>Receiving Federal Funds;<br>Aiding and Abetting<br>(18 U.S.C. § 666(a)(2); 18 U.S.C. § 2)<br><br>Count Six: Conspiracy to Commit Extortion<br>(18 U.S.C. § 1951)<br><br>Counts Seven-Ten: Extortion<br>(18 U.S.C. § 1951)<br><br>Forfeiture Allegation:<br>(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461) |

INDICTMENT

At all times relevant to this Indictment:

General Allegations

1.    Defendant CEDRIC CROMWELL was a resident of Attleboro, Massachusetts.

2.    Defendant DAVID DEQUATTRO was a resident of Warwick, Rhode Island.

3.    The Mashpee Wampanoag Tribe (the "Tribe") was a Native American tribe based

in Mashpee, Massachusetts. The Tribe had approximately 3,000 members. In 2007, the U.S. Secretary of the Interior recognized the Tribe as an Indian Tribe under federal law.

4.      In each of 2014, 2015, 2016, 2017, and 2018, the Tribe received federal grants totaling more than $10,000.

5.      The governing body of the Tribe was the Mashpee Wampanoag Tribal Council (the "Tribal Council"), all of whom were members of the Tribe. Chairperson of the Tribal Council, also known as Chairperson of the Tribe, was a four-year elected position.

6.      The Tribal membership elected CROMWELL as their Chairman in 2009. He was reelected in 2013 and 2017.

7.      The Tribe's Constitution gave CROMWELL the authority to "preside over all meetings of the Tribal Council" and "perform the usual duties of a Chairperson, including but not limited to, acting as the official spokesperson for the Tribe, engaging in public relations, serving as coordinator over all Tribal government activities, and exercising any authority delegated to [him] by the Tribal Council."

8.      DEQUATTRO was a licensed architect and a shareholder, officer, and director of an architecture and design firm in Providence, Rhode Island (the "Company"). The Company engaged in interstate commerce.

9.      The President and Controller of the Company (the "Company President"), who was also a shareholder and director, had the authority to direct, and did direct, the payment of Company funds, including for employee payroll purposes.

### The Company's Contract with the Mashpee Wampanoag Gaming Authority to Serve as Owner's Representative for the First Light Casino Project

10.     Prior to 2012, the Tribal membership voted to build and operate a resort and casino in Taunton, Massachusetts, which they planned to call the First Light Resort and Casino, to generate revenue for the Tribe.

11.     In 2012, the Tribal Council adopted Mashpee Wampanoag Tribal Gaming Authority Ordinance 2012-ORD-004 (as amended, the "Ordinance"), which created the Mashpee Wampanoag Gaming Authority (the "Gaming Authority") as an unincorporated limited liability company wholly owned by the Tribe.

12.     The Ordinance provided that the Gaming Authority would be governed and managed by a Board of Directors consisting of between three and five Tribal members, including the Chairman of the Tribal Council, who would automatically serve as the President of the Board of Directors. All members of the Board of Directors, including the President, were voting members.

13.     At all times relevant to this Indictment, CROMWELL was a voting member, and the President, of the Gaming Authority's five-member Board of Directors.

14.     The Ordinance gave the Gaming Authority, acting through its Board of Directors, exclusive power, to, among other things, "do any and all things necessary or desirable in connection with the development, design, financing, construction, equipping, leasing, operation, management . . . , maintenance, and promotion" of the First Light Resort and Casino, including to "hire [and] fire . . . consultants, . . . [and] prescribe their duties and compensation."

15.     The Gaming Authority and the Company entered into a Consultant Services

3

Agreement dated May 7, 2014, for the Company to serve as the "owner's representative" for the Gaming Authority during both the preconstruction and construction phases of the casino project (the "Contract"). The Contract was signed by CROMWELL on behalf of the Gaming Authority and DEQUATTRO on behalf of the Company.

16.     The Contract did not have a termination date. It stated that either party could terminate the Contract for cause with seven days' notice, or "for convenience" with one month's notice.

Objects and Purposes of the Conspiracies
to Commit Federal Programs Bribery and Extortion

17.     The objects of the conspiracy to commit federal programs bribery were for CROMWELL to use his position and influence as Chairman of the Tribe and President of the Gaming Authority to solicit and accept payments and other things of value from the Company through DEQUATTRO, in exchange for favorable action or inaction on the Contract by the Gaming Authority, and for DEQUATTRO to give money and other things of value from the Company to CROMWELL in exchange for favorable action or inaction on the Contract by the Gaming Authority. The purpose of the conspiracy was for CROMWELL, DEQUATTRO, and the Company President to enrich themselves personally.

18.     The object of the conspiracy to commit extortion was for CROMWELL to use his position and influence as Chairman of the Tribe and President of the Gaming Authority to obtain property not due to him, from the Company, with the consent of DEQUATTRO and the Company President, in exchange for favorable action or inaction on the Contract by the Gaming Authority. The purpose of the conspiracy was for CROMWELL to enrich himself personally.

### Manner and Means of the Conspiracies
### to Commit Federal Programs Bribery and Extortion

19.   Among the manner and means by which CROMWELL, DEQUATTRO, and others

known and unknown to the Grand Jury carried out the conspiracies were the following:

a.   Between on or about July 26, 2014, and on or about May 18, 2017, the
Company, through DEQUATTRO, provided CROMWELL with a stream of
payments and in-kind benefits valued at not less than $57,549.37, and, in
exchange, between on or about July 18, 2014, and on or about February 15,
2018, the Company was paid approximately $4,966,287.16 under the Contract.

b.   CROMWELL incorporated One Nation Development LLC ("One Nation
Development") and was its sole shareholder, officer, and director.
CROMWELL used One Nation Development as a shell entity to collect
payments, including from DEQUATTRO. One Nation Development was not a
Section 501(c)(3) charitable organization. CROMWELL spent all One Nation
Development funds on personal expenses, including payments to his mistress.

c.   CROMWELL solicited payments from the Company through DEQUATTRO
under the pretext that they were donations to his reelection campaign and/or
charitable contributions to One Nation Development. DEQUATTRO agreed to
make the payments knowing they were neither donations to CROMWELL's
reelection campaign nor charitable contributions.

d.   CROMWELL and DEQUATTRO agreed to disguise the identity of the payer
by using checks written on DEQUATTRO's personal account instead of

5

Company checks.

e.  DEQUATTRO and the Company President agreed that the Company would reimburse DEQUATTRO for his payments to CROMWELL.

f.  CROMWELL and DEQUATTRO agreed that DEQUATTRO would pay CROMWELL through an intermediary called CM International Consulting LLC ("CM International"), which CROMWELL's friend ("Friend A") owned.

g.  DEQUATTRO wrote personal checks payable to CM International knowing the money would go to CROMWELL.

h.  At CROMWELL's direction, Friend A deposited DEQUATTRO's checks into a CM International account and used the funds to buy treasurer's checks payable to CROMWELL or One Nation Development.

i.  CROMWELL deposited the treasurer's checks in two accounts, an account he held jointly with his wife and an account opened in the name of One Nation Development. CROMWELL spent the funds on personal expenses.

j.  DEQUATTRO and the Company President agreed to disguise the Company's reimbursement payments to DEQUATTRO by characterizing them as employee bonus payments or single-paycheck salary increases and recording them on the Company's books as payroll expenses. The reimbursements were paid either in Company checks that DEQUATTRO deposited into his personal account, or in paychecks that were direct-deposited into DEQUATTRO's personal account.

Overt Acts in Furtherance of the Conspiracy to Commit Federal Programs Bribery,
and Acts in Furtherance of the Conspiracy to Commit Extortion

20.     Between on or before July 1, 2014, and on or about August 18, 2017, CROMWELL, DEQUATTRO, and coconspirators known and unknown to the Grand Jury committed and caused to be committed the following overt acts, among others, in furtherance of the conspiracy to commit federal programs bribery, and acts in furtherance of the conspiracy to commit extortion:

*The First $10,000 Check*

21.     On or before July 1, 2014, CROMWELL asked DEQUATTRO for $10,000.

22.     On or before July 1, 2014, Friend A, acting at CROMWELL's direction, told DEQUATTRO to make the $10,000 check payable to CM International.

23.     On or about July 26, 2014, DEQUATTRO wrote a personal check for $10,000 payable to CM International.

24.     On or about July 28, 2014, Friend A, acting at CROMWELL's direction, deposited DEQUATTRO's check into a CM International bank account.

25.     On or about August 5, 2014, Friend A, acting at CROMWELL's direction, bought a $4,000 treasurer's check payable to CROMWELL.

26.     On or about August 5, 2014, CROMWELL deposited the $4,000 check into a checking account he held jointly with his wife. CROMWELL spent the funds on personal expenses.

27.     On or about August 12, 2014, Friend A, acting at CROMWELL's direction, bought two $3,000 treasurer's checks payable to CROMWELL.

28.     On or about August 12, 2014, CROMWELL deposited the two $3,000 checks into a checking account he held jointly with his wife. CROMWELL spent the funds on personal expenses.

29.     On or about July 23, 2014, the Company President authorized and signed a Company check payable to DEQUATTRO to reimburse DEQUATTRO for his $10,000 bribe payment to CROMWELL. The Company President processed the reimbursement as an employee bonus check, and recorded it on the Company's books as a payroll expense, to conceal its true nature.

30.     On or about July 24, 2014, DEQUATTRO deposited the "bonus" check into his savings account to reimburse himself for paying the $10,000 bribe to CROMWELL.

*The Second $10,000 Check*

31.     On or before September 1, 2014, CROMWELL asked DEQUATTRO for another $10,000.

32.     On or about September 1, 2014, DEQUATTRO wrote a personal check for $10,000 payable to CM International.

33.     On or about September 3, 2014, Friend A, acting at CROMWELL's direction, deposited DEQUATTRO's check into a CM International bank account.

34.     On or about September 3, 2014, Friend A, acting at CROMWELL's direction, bought two $5,000 treasurer's checks payable to CROMWELL.

35.     On or about September 3, 2014, CROMWELL deposited the two $5,000 checks into a checking account he held jointly with his wife. CROMWELL spent the funds on personal expenses.

36.     On or about September 3, 2014, the Company President authorized and signed a Company check payable to DEQUATTRO to reimburse DEQUATTRO for his second $10,000 bribe payment to CROMWELL. The Company President processed the reimbursement as an employee bonus check, and recorded it on the Company's books as a payroll expense, to conceal its true nature.

37.     On or about September 5, 2014, DEQUATTRO deposited the "bonus" check into his savings account to reimburse himself for paying the second $10,000 bribe to CROMWELL.

*The Third $10,000 Check*

38.     On or before October 31, 2014, CROMWELL asked DEQUATTRO for another $10,000.

39.     On or about October 31, 2014, DEQUATTRO wrote a personal check for $10,000 payable to CM International.

40.     On or about November 1, 2014, Friend A, acting at CROMWELL's direction, deposited DEQUATTRO's check into a CM International bank account.

41.     On or about November 1, 2014, Friend A, acting at CROMWELL's direction, bought a treasurer's check for $8,800 payable to CROMWELL.

42.     On or about November 3, 2014, CROMWELL deposited the $8,800 check into a checking account he held jointly with his wife. CROMWELL spent the funds on personal expenses.

43.     On or about November 17, 2014, the Company President authorized and signed a Company check payable to DEQUATTRO to reimburse DEQUATTRO for his third $10,000 bribe payment to CROMWELL. The Company President processed the reimbursement as an employee

bonus check, and recorded it on the Company's books as a payroll expense, to conceal its true nature.

44.     On or about November 19, 2014, DEQUATTRO deposited the "bonus" check into his savings account to reimburse himself for paying the third $10,000 bribe to CROMWELL.

*The Fourth $10,000 Check*

45.     On or about September 16, 2014, CROMWELL incorporated One Nation Development.

46.     On or about December 8, 2014, CROMWELL opened a bank account in the name of Cedric D. CROMWELL dba One Nation Development (the "One Nation Development account").

47.     On or before January 6, 2015, CROMWELL asked DEQUATTRO for another $10,000.

48.     On or about January 6, 2015, DEQUATTRO wrote a personal check for $10,000 payable to CM International.

49.     On or about January 6, 2015, Friend A, acting at CROMWELL's direction, deposited DEQUATTRO's check into a CM International bank account.

50.     On or about January 6, 2015, Friend A, acting at CROMWELL's direction, bought a treasurer's check for $10,000 payable to One Nation Development.

51.     On or about January 6, 2015, CROMWELL deposited the $10,000 treasurer's check into the One Nation Development account. CROMWELL spent the funds on personal expenses.

10

52.     On or about February 18, 2015, the Company President authorized and signed a Company check payable to DEQUATTRO to reimburse DEQUATTRO for his fourth $10,000 bribe payment to CROMWELL. The Company President processed the reimbursement as an employee bonus check, and recorded it on the Company's books as a payroll expense, to conceal its true nature.

53.     On or about February 19, 2015, DEQUATTRO deposited the "bonus" check into his savings account to reimburse himself for paying the fourth $10,000 bribe to CROMWELL.

54.     On or about March 27, 2015, CROMWELL signed Gaming Authority check no. 51544 payable to the Company for $179,838.42 invoiced under the Contract.

*The Fifth $10,000 Check*

55.     On or about November 12, 2015, CROMWELL sent DEQUATTRO an email, attaching an unsigned letter that was not on letterhead. It stated: "Dear Dave, One Development will use the $10,000.00 dollar donation for Political Action Committee food towards food, campaigns and elections. Regards, Cedric Cromwell, One Nation Development."

56.     On or about November 13, 2015, DEQUATTRO wrote a personal check for $10,000 payable to One Nation Development.

57.     On or about November 14, 2015, CROMWELL negotiated the check, depositing $9,500 into the One Nation Development account and withdrawing $500 in cash.

58.     On or about November 16, 2015, the Company President authorized a Company payment to reimburse DEQUATTRO for his fifth $10,000 bribe payment to CROMWELL. The Company President processed the reimbursement as a single-paycheck salary increase, and recorded it on the Company's books as a payroll expense, to conceal its true nature.

11

59.     On or about November 18, 2015, the artificially increased paycheck was direct-deposited into DEQUATTRO's checking account to reimburse him for his fifth $10,000 bribe payment to CROMWELL.

60.     On or about January 29, 2016, CROMWELL cosigned Gaming Authority check no. 52001 to the Company for $324,387.01 invoiced under the Contract.

61.     On or about April 22, 2016, CROMWELL cosigned Gaming Authority check no. 52160 to the Company for $126,355.77 invoiced under the Contract.

62.     On or about May 20, 2016, CROMWELL cosigned Gaming Authority check no. 52234 to the Company for $184,858.87 invoiced under the Contract.

63.     On or about June 24, 2016, CROMWELL cosigned Gaming Authority check no. 52309 to the Company for $127,002.05 invoiced under the Contract.

*The Bowflex Revolution Home Gym*

64.     On or before August 2, 2016, CROMWELL asked DEQUATTRO for exercise equipment for CROMWELL's personal use. DEQUATTRO told the Company President about CROMWELL's request.

65.     On or about August 2, 2016, the Company President responded to a Craigslist post advertising the sale of a used Bowflex Revolution home gym, with free delivery.

66.     On or about August 3, 2016, the Company President emailed the seller to arrange for purchase of the Bowflex Revolution, to be delivered to CROMWELL's home in Attleboro, Massachusetts.

12

67.    On or about August 5, 2016, the seller delivered the Bowflex Revolution to CROMWELL's home. DEQUATTRO met the seller there and paid him $1,700 cash. The Company President reimbursed DEQUATTRO for half the price.

68.    On or about August 5, 2016, CROMWELL cosigned Gaming Authority check no. 52411 to the Company for $122,772.77 invoiced under the Contract.

69.    On or about September 9, 2016, CROMWELL cosigned Gaming Authority check no. 52485 to the Company for $166,500.21 invoiced under the Contract.

70.    On or about October 7, 2016, CROMWELL cosigned Gaming Authority check no. 52534 to the Company for $292,955.32 invoiced under the Contract.

71.    On or about November 18, 2016, CROMWELL cosigned Gaming Authority check no. 52582 to the Company for $84,401.00 invoiced under the Contract.

*The Sixth Check*

72.    On or about December 23, 2016, a friend of CROMWELL's who worked as the Gaming Authority's Program Manager ("Friend B"), acting at CROMWELL's direction, texted DEQUATTRO: "Below is the name of the pizza place in case you need it for the fundraiser[:] Barnstable pizza and pasta co inc . . . ."

73.    On or about January 3, 2017, Friend B, acting at CROMWELL's direction, texted DEQUATTRO: "Another option is the [sic] cut the check to the following Company[:] CM International LLC . . . . Note: Chairman Cedric Cromwell Campaign. Either way let me know by end of day by phone."

74.    On or about January 12, 2017, DEQUATTRO wrote a personal check for $4,000 payable to CM International.

13

75.    On or about January 17, 2017, Friend A, acting at CROMWELL's direction, deposited DEQUATTRO's check into a CM International account and withdrew $4,000 in cash.

76.    On or about January 17, 2017, the Company President authorized a payment to reimburse DEQUATTRO for his $4,000 bribe payment to CROMWELL. The Company President processed the reimbursement as an employee bonus payment rolled into DEQUATTRO's weekly paycheck, and recorded it on the Company's books as a payroll expense, to conceal its true nature.

77.    On or about January 18, 2017, the artificially increased paycheck was direct-deposited into DEQUATTRO's checking account to reimburse him for his $4,000 bribe payment to CROMWELL.

78.    On or about January 20, 2017, CROMWELL cosigned Gaming Authority check no. 52680 to the Company for $215,583.03 invoiced under the Contract.

79.    On or about March 31, 2017, CROMWELL cosigned Gaming Authority check no. 52756 to the Company for $71,772.89 invoiced under the Contract.

*CROMWELL's Birthday Weekend at the Seaport Boston Hotel*

80.    On or about May 15, 2017, CROMWELL texted DEQUATTRO: "Hello Dave. I hope all is well. My Birthday is coming up this Friday May 19th and I wanted to spend Friday through Monday at a very nice hotel in Boston on for my Birthday weekend. Is it possible that you can get me a nice hotel room at the Four Seasons or a suite at the Seaport Hotel? I am going to have a special guest with me. Please let me know and Thank You."

81.    On or about May 15, 2017, DEQUATTRO texted CROMWELL's message to the Company President, adding "Guess who" and "u can't think of this stuff.......what is next?"

14

82.     On or about May 17, 2017, the Seaport Boston Hotel sent an email to DEQUATTRO confirming a reservation for CROMWELL for May 19-22, 2017, room type "Executive Suite King – Harbor View," listing a nightly room rate of $530 for May 19, $548 for May 20, and $530 for May 21.

83.     On or about May 18, 2017, DEQUATTRO used the Company's credit card to pay $1,849.37 of the Seaport Boston Hotel invoice totaling $2,467.17, which included expenses for valet parking, room service breakfast and dinner, and a tab at the hotel's Tamo Lounge.

84.     On or about May 26, 2017, CROMWELL cosigned Gaming Authority check no. 52813 to the Company for $156,908.84 invoiced under the Contract.

85.     On or about May 26, 2017, CROMWELL cosigned Gaming Authority check no. 52847 to the Company for $140,147.29 invoiced under the Contract.

86.     On or about August 18, 2017, CROMWELL cosigned Gaming Authority check no. 52968 to the Company for $74,816.87 invoiced under the Contract.

COUNT ONE
Conspiracy to Commit Federal Programs Bribery
(18 U.S.C. § 371)

The Grand Jury charges:

87.    The Grand Jury re-alleges and incorporates by reference paragraphs 1-86 of this

Indictment.

88.    From on or about July 1, 2014, through on or about August 18, 2017, in the

District of Massachusetts, and elsewhere, the defendants,

(1) CEDRIC CROMWELL and
(2) DAVID DEQUATTRO,

conspired with each other and with others known and unknown to the Grand Jury to commit

offenses against the United States, to wit, violations of Title 18, United States Code, Sections

666(a)(1)(B) and (a)(2), that is:

a.  being an agent of an Indian tribal government, to corruptly solicit and demand for the

benefit of any person, and accept and agree to accept, anything of value from any person,

intending to be influenced and rewarded in connection with any business, transaction and

series of transactions of such Indian tribal government involving anything of value of

$5,000 or more, where such Indian tribal government received benefits in excess of

$10,000 under a Federal program involving a grant, contract, subsidy, loan guarantee,

insurance or other form of Federal assistance in any one-year period; and

b.  to corruptly give, offer, and agree to give anything of value of to any person, with intent

to influence and reward an agent of an Indian tribal government, in connection with any

business, transaction and series of transactions of such Indian tribal government

involving anything of value of $5,000 or more, where such Indian tribal government

16

received benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan guarantee, insurance or other form of Federal assistance in any one-year period.

All in violation of Title 18, United States Code, Section 371.

## COUNTS TWO-THREE
### Bribery Concerning Programs Receiving Federal Funds; Aiding and Abetting
### (18 U.S.C. § 666(a)(1)(B); 18 U.S.C. § 2)

The Grand Jury further charges:

89.     The Grand Jury re-alleges and incorporates by reference paragraphs 1-86 of this Indictment.

90.     On or about the following dates, in the District of Massachusetts, and elsewhere, the defendant,

### CEDRIC CROMWELL,

being an agent of an Indian tribal government, or any agency thereof, namely, the Mashpee Wampanoag Tribe, corruptly solicited and demanded for the benefit of any person, and accepted and agreed to accept, anything of value from any person, intending to be influenced and rewarded in connection with any business, transaction and series of transactions of such tribal government involving anything of value of $5,000 or more, where such tribal government received benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan guarantee, insurance or other form of Federal assistance in any one-year period:

| Count | Transaction |
|-------|-------------|
| 2 | $10,000 bribe from the Company through DEQUATTRO on or about 11/13/15 |
| 3 | Bribes from the Company through DEQUATTRO of a Bowflex Revolution home gym valued at $1,700 on or about 8/5/16; $4,000 on or about 1/12/17; and $1,849.37 paid on or about 5/18/17 for a stay at the Seaport Boston Hotel |

All in violation of Title 18, United States Code, Sections 666(a)(1)(B) and 2.

18

COUNTS FOUR-FIVE
Bribery Concerning Programs Receiving Federal Funds; Aiding and Abetting
(18 U.S.C. § 666(a)(2); 18 U.S.C. § 2)

The Grand Jury further charges:

91.     The Grand Jury re-alleges and incorporates by reference paragraphs 1-86 of this Indictment.

92.     On or about the following dates, in the District of Massachusetts, and elsewhere, the defendant,

DAVID DEQUATTRO,

corruptly gave, offered, and agreed to give anything of value to any person, with intent to influence and reward an agent of an Indian tribal government, or any agency thereof, namely, the Mashpee Wampanoag Tribe, in connection with any business, transaction and series of transactions of such tribal government involving anything of value of $5,000 or more, where such tribal government received benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan guarantee, insurance or other form of Federal assistance in any one-year period:

| Count | Transaction |
|-------|-------------|
| 4 | $10,000 bribe from the Company to CROMWELL on or about 11/13/15 |
| 5 | Bribes from the Company to CROMWELL of a Bowflex Revolution home gym valued at $1,700 on or about 8/5/16; $4,000 on or about 1/12/17; and $1,849.37 paid on or about 5/18/17 for a stay at the Seaport Boston Hotel |

All in violation of Title 18, United States Code, Sections 666(a)(2) and 2.

## COUNT SIX
Conspiracy to Commit Extortion
(18 U.S.C. § 1951)

The Grand Jury further charges:

93.     The Grand Jury re-alleges and incorporates by reference paragraphs 1-86 of this Indictment.

94.     From on or about July 1, 2014, through on or about August 18, 2017, in the District of Massachusetts, and elsewhere, the defendant,

CEDRIC CROMWELL,

conspired with others known and unknown to the Grand Jury to obstruct, delay, and affect, and attempt to obstruct, delay, and affect, in any way and degree, commerce and the movement of any article and commodity in commerce, by extortion, as that term is defined in Title 18, United States Code, section 1951; that is, by obtaining property not due to the defendant, from the Company, with the consent of DEQUATTRO and the Company President, under color of official right.

All in violation of Title 18, United States Code, Section 1951.

20

## COUNTS SEVEN-TEN
### Extortion
### (18 U.S.C. § 1951)

The Grand Jury further charges:

95.     The Grand Jury re-alleges and incorporates by reference paragraphs 1-86 of this Indictment.

96.     On or about the following dates, in the District of Massachusetts, and elsewhere, the defendant,

### CEDRIC CROMWELL,

did obstruct, delay and affect, and attempt to obstruct delay and affect, in any way and degree, commerce and the movement of any article and commodity in commerce, by extortion, as that term is defined in Title 18, United States Code, section 1951; that is, by obtaining property not due to the defendant, from the Company, with the consent of DEQUATTRO and the Company President, under color of official right:

| Count | Transaction |
|---|---|
| 7 | $10,000 payment on or about 11/13/15 |
| 8 | Bowflex Revolution home gym valued at $1,700 on or about 8/5/16 |
| 9 | $4,000 payment on or about 1/12/17 |
| 10 | $1,849.37 payment on or about 5/18/17 for a stay at the Seaport Boston Hotel |

All in violation of Title 18, United States Code, Section 1951.

FORFEITURE ALLEGATION
(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

1.      Upon conviction of one or more of the offenses in violation Title 18, United States Code, Sections 2, 371, 666, and 1951, set forth in Counts One through Ten, the defendants,

CEDRIC CROMWELL and
DAVID DEQUATTRO,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property constituting, or derived from, proceeds traceable to the offenses. The property to be forfeited includes, but is not limited to, the following:

> a.   An amount to be determined as sentencing, to be entered in the form of a forfeiture money judgment.

2.      If any of the property described in Paragraph 1, above, as being forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), as a result of any act or omission of the defendants --

> a.   cannot be located upon the exercise of due diligence;
>
> b.   has been transferred or sold to, or deposited with, a third party;
>
> c.   has been placed beyond the jurisdiction of the Court;
>
> d.   has been substantially diminished in value; or
>
> e.   has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the property described in Paragraph 1 above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

A TRUE BILL

FOREPERSON

CHRISTINE WICHERS
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF MASSACHUSETTS

District of Massachusetts: NOVEMBER 12, 2020
Returned into the District Court by the Grand Jurors and filed.

/s/ Thomas F. Quinn 11/12/20 @ 4:20pm
DEPUTY CLERK

23