UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal No. 20-10271-DPW |
| | Violations: |
| v. | |
| | Count One: Conspiracy to Commit Federal Programs Bribery (18 U.S.C. § 371) |
| (1) CEDRIC CROMWELL and (2) DAVID DEQUATTRO, | |
| | Counts Two-Three: Bribery Concerning Programs Receiving Federal Funds; Aiding and Abetting (18 U.S.C. § 666(a)(1)(B); 18 U.S.C. § 2) |
| Defendants | |
| | Counts Four-Five: Bribery Concerning Programs Receiving Federal Funds; Aiding and Abetting (18 U.S.C. § 666(a)(2); 18 U.S.C. § 2) |
| | Count Six: Conspiracy to Commit Extortion (18 U.S.C. § 1951) |
| | Counts Seven-Ten: Extortion (18 U.S.C. § 1951) |
| | Counts Eleven-Fourteen: Filing False Tax Returns (26 U.S.C. § 7206(1)) |
| | Forfeiture Allegation: (18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461) |

SUPERSEDING INDICTMENT

At all times relevant to this Superseding Indictment:

General Allegations

1.    Defendant CEDRIC CROMWELL was a resident of Attleboro, Massachusetts.

2.    Defendant DAVID DEQUATTRO was a resident of Warwick, Rhode Island.

1

3.     The Mashpee Wampanoag Tribe (the "Tribe") was a Native American tribe based in Mashpee, Massachusetts. The Tribe had approximately 3,000 members. In 2007, the U.S. Secretary of the Interior recognized the Tribe as an Indian Tribe under federal law.

4.     In each of 2014, 2015, 2016, 2017, and 2018, the Tribe received federal grants totaling more than $10,000.

5.     The governing body of the Tribe was the Mashpee Wampanoag Tribal Council (the "Tribal Council"), all of whom were members of the Tribe. Chairperson of the Tribal Council, also known as Chairperson of the Tribe, was a four-year elected position.

6.     The Tribal membership elected CROMWELL as their Chairman in 2009. He was reelected in 2013 and 2017.

7.     In federal personal income tax returns, Forms 1040, filed jointly with his wife, CROMWELL reported receiving the following salary from the Tribe in 2014-2017:

| 2014 | $130,624 |
| 2015 | $147,677 |
| 2016 | $182,027 |
| 2017 | $180,377 |

8.     The Tribe's Constitution gave CROMWELL the authority to "preside over all meetings of the Tribal Council" and "perform the usual duties of a Chairperson, including but not limited to, acting as the official spokesperson for the Tribe, engaging in public relations, serving as coordinator over all Tribal government activities, and exercising any authority delegated to [him] by the Tribal Council."

9.     DEQUATTRO was a licensed architect and a shareholder, officer, and director of an architecture and design firm in Providence, Rhode Island (the "Company"). The Company engaged in interstate commerce.

10.     The President and Controller of the Company (the "Company President"), who was also a shareholder and director, had the authority to direct, and did direct, the payment of Company funds, including for employee payroll purposes.

<u>The Company's Contract with the Mashpee Wampanoag Gaming Authority</u>
<u>to Serve as Owner's Representative for the First Light Casino Project</u>

11.     Prior to 2012, the Tribal membership voted to build and operate a resort and casino in Taunton, Massachusetts, which they planned to call the First Light Resort and Casino, to generate revenue for the Tribe.

12.     In 2012, the Tribal Council adopted Mashpee Wampanoag Tribal Gaming Authority Ordinance 2012-ORD-004 (as amended, the "Ordinance"), which created the Mashpee Wampanoag Gaming Authority (the "Gaming Authority") as an unincorporated limited liability company wholly owned by the Tribe.

13.     The Ordinance provided that the Gaming Authority would be governed and managed by a Board of Directors consisting of between three and five Tribal members, including the Chairman of the Tribal Council, who would automatically serve as the President of the Board of Directors. All members of the Board of Directors, including the President, were voting members.

14.     CROMWELL was a voting member, and the President, of the Gaming Authority's five-member Board of Directors.

15.     The Ordinance gave the Gaming Authority, acting through its Board of Directors, exclusive power, to, among other things, "do any and all things necessary or desirable in connection with the development, design, financing, construction, equipping, leasing, operation, management . . . , maintenance, and promotion" of the First Light Resort and Casino, including

3

to "hire [and] fire . . . consultants, . . . [and] prescribe their duties and compensation."

16.     The Gaming Authority and the Company entered into a Consultant Services Agreement dated May 7, 2014, for the Company to serve as the "owner's representative" for the Gaming Authority during both the preconstruction and construction phases of the casino project (the "Contract"). The Contract was signed by CROMWELL on behalf of the Gaming Authority and DEQUATTRO on behalf of the Company.

17.     The Contract did not have a termination date. It stated that either party could terminate the Contract for cause with seven days' notice, or "for convenience" with one month's notice.

<u>CROMWELL'S Three Limited Liability Companies</u>

18.     On or about September 16, 2014, CROMWELL formed One Nation Development LLC ("One Nation Development") under Delaware law. CROMWELL dissolved One Nation Development on or about December 16, 2016.

19.     On or about January 1, 2017, CROMWELL formed New Light Concepts LLC ("New Light Concepts") under Delaware law. CROMWELL dissolved New Light Concepts on or about October 11, 2017.

20.     On or about October 9, 2017, CROMWELL formed Lite Works LLC ("Lite Works") under Delaware law. CROMWELL dissolved Lite Works on or about January 17, 2019.

21.     On or about October 15, 2018, in answers to interrogatories in a civil lawsuit, CROMWELL represented that his position with his three limited liability companies was the same: "Consultant\owner," and, more specifically, "Consultant on Carbon Sequestration. Indian Country liaison to Tribal Carbon Forestry Markets."

22.     CROMWELL opened a bank account for One Nation Development on or about December 8, 2014. CROMWELL was the only authorized signatory. CROMWELL closed the account on or about September 30, 2016.

23.     CROMWELL opened a bank account for New Light Concepts on or about January 10, 2017. CROMWELL and his wife were the only authorized signatories. CROMWELL closed the account on or about October 4, 2017.

24.     CROMWELL opened a bank account for Lite Works on or about October 12, 2017. CROMWELL was the only authorized signatory. CROMWELL closed the account on or about November 28, 2018.

25.     On his 2017 personal income tax return, Form 1040, CROMWELL reported receiving $114,000 in gross income through Lite Works, a business he described as "support activities for forestry."

<u>Objects and Purposes of the Conspiracies</u>
<u>to Commit Federal Programs Bribery and Extortion</u>

26.     The objects of the conspiracy to commit federal programs bribery were for CROMWELL to use his position and influence as Chairman of the Tribe and President of the Gaming Authority to solicit and accept payments and other things of value from the Company through DEQUATTRO, in exchange for favorable action or inaction on the Contract by the Gaming Authority, and for DEQUATTRO to give money and other things of value from the Company to CROMWELL in exchange for favorable action or inaction on the Contract by the Gaming Authority. The purpose of the conspiracy was for CROMWELL, DEQUATTRO, and the Company President to enrich themselves personally.

27.     The object of the conspiracy to commit extortion was for CROMWELL to use his position and influence as Chairman of the Tribe and President of the Gaming Authority to obtain property not due to him, from the Company, with the consent of DEQUATTRO and the Company President, in exchange for favorable action or inaction on the Contract by the Gaming Authority. The purpose of the conspiracy was for CROMWELL to enrich himself personally.

Manner and Means of the Conspiracies
to Commit Federal Programs Bribery and Extortion

28.     Among the manner and means by which CROMWELL, DEQUATTRO, and others known and unknown to the Grand Jury carried out the conspiracies were the following:

a.  Between on or about July 26, 2014, and on or about May 18, 2017, the Company, through DEQUATTRO, provided CROMWELL with a stream of payments and in-kind benefits valued at not less than $57,549.37, and, in exchange, between on or about July 18, 2014, and on or about February 15, 2018, the Company was paid approximately $4,966,287.16 under the Contract.

b.  CROMWELL used One Nation Development as a shell entity to collect payments, including from DEQUATTRO. One Nation Development was not a Section 501(c)(3) charitable organization. CROMWELL spent One Nation Development funds on personal expenses, including payments to his mistress.

c.  CROMWELL solicited payments from the Company through DEQUATTRO under the pretext that they were donations to his reelection campaign and/or charitable contributions to One Nation Development. DEQUATTRO agreed to make the payments knowing they were neither donations to CROMWELL's reelection campaign nor charitable contributions.

d. CROMWELL and DEQUATTRO agreed to disguise the identity of the payer by using checks written on DEQUATTRO's personal account instead of Company checks.

e. DEQUATTRO and the Company President agreed that the Company would reimburse DEQUATTRO for his payments to CROMWELL.

f. CROMWELL and DEQUATTRO agreed that DEQUATTRO would pay CROMWELL through an intermediary called CM International Consulting LLC ("CM International"), which CROMWELL's friend ("Friend A") owned.

g. DEQUATTRO wrote personal checks payable to CM International knowing the money would go to CROMWELL.

h. At CROMWELL's direction, Friend A deposited DEQUATTRO's checks into a CM International account and used the funds to buy treasurer's checks payable to CROMWELL or One Nation Development.

i. CROMWELL deposited the treasurer's checks in two bank accounts, an account he held jointly with his wife and his One Nation Development account. CROMWELL spent the funds on personal expenses.

j. DEQUATTRO and the Company President agreed to disguise the Company's reimbursement payments to DEQUATTRO by characterizing them as employee bonus payments or single-paycheck salary increases and recording them on the Company's books as payroll expenses. The reimbursements were paid either in Company checks that DEQUATTRO deposited into his personal account, or in paychecks that were direct-deposited into DEQUATTRO's

7

personal account.

<u>Overt Acts in Furtherance of the Conspiracy to Commit Federal Programs Bribery,<br>and Acts in Furtherance of the Conspiracy to Commit Extortion</u>

29.     Between on or before July 1, 2014, and on or about August 18, 2017, CROMWELL, DEQUATTRO, and coconspirators known and unknown to the Grand Jury committed and caused to be committed the following overt acts, among others, in furtherance of the conspiracy to commit federal programs bribery, and acts in furtherance of the conspiracy to commit extortion:

*The First $10,000 Check*

30.     On or before July 1, 2014, CROMWELL asked DEQUATTRO for $10,000.

31.     On or before July 1, 2014, Friend A, acting at CROMWELL's direction, told DEQUATTRO to make the $10,000 check payable to CM International.

32.     On or about July 26, 2014, DEQUATTRO wrote a personal check for $10,000 payable to CM International.

33.     On or about July 28, 2014, Friend A, acting at CROMWELL's direction, deposited DEQUATTRO's check into a CM International bank account.

34.     On or about August 5, 2014, Friend A, acting at CROMWELL's direction, bought a $4,000 treasurer's check payable to CROMWELL.

35.     On or about August 5, 2014, CROMWELL deposited the $4,000 check into a checking account he held jointly with his wife. CROMWELL spent the funds on personal expenses.

36.     On or about August 12, 2014, Friend A, acting at CROMWELL's direction, bought two $3,000 treasurer's checks payable to CROMWELL.

37.     On or about August 12, 2014, CROMWELL deposited the two $3,000 checks into a checking account he held jointly with his wife. CROMWELL spent the funds on personal expenses.

38.     On or about July 23, 2014, the Company President authorized and signed a Company check payable to DEQUATTRO to reimburse DEQUATTRO for his $10,000 bribe payment to CROMWELL. The Company President processed the reimbursement as an employee bonus check, and recorded it on the Company's books as a payroll expense, to conceal its true nature.

39.     On or about July 24, 2014, DEQUATTRO deposited the "bonus" check into his savings account to reimburse himself for paying the $10,000 bribe to CROMWELL.

*The Second $10,000 Check*

40.     On or before September 1, 2014, CROMWELL asked DEQUATTRO for another $10,000.

41.     On or about September 1, 2014, DEQUATTRO wrote a personal check for $10,000 payable to CM International.

42.     On or about September 3, 2014, Friend A, acting at CROMWELL's direction, deposited DEQUATTRO's check into a CM International bank account.

43.     On or about September 3, 2014, Friend A, acting at CROMWELL's direction, bought two $5,000 treasurer's checks payable to CROMWELL.

44.     On or about September 3, 2014, CROMWELL deposited the two $5,000 checks into a checking account he held jointly with his wife. CROMWELL spent the funds on personal expenses.

45.     On or about September 3, 2014, the Company President authorized and signed a Company check payable to DEQUATTRO to reimburse DEQUATTRO for his second $10,000 bribe payment to CROMWELL. The Company President processed the reimbursement as an employee bonus check, and recorded it on the Company's books as a payroll expense, to conceal its true nature.

46.     On or about September 5, 2014, DEQUATTRO deposited the "bonus" check into his savings account to reimburse himself for paying the second $10,000 bribe to CROMWELL.

*The Third $10,000 Check*

47.     On or before October 31, 2014, CROMWELL asked DEQUATTRO for another $10,000.

48.     On or about October 31, 2014, DEQUATTRO wrote a personal check for $10,000 payable to CM International.

49.     On or about November 1, 2014, Friend A, acting at CROMWELL's direction, deposited DEQUATTRO's check into a CM International bank account.

50.     On or about November 1, 2014, Friend A, acting at CROMWELL's direction, bought a treasurer's check for $8,800 payable to CROMWELL.

51.     On or about November 3, 2014, CROMWELL deposited the $8,800 check into a checking account he held jointly with his wife. CROMWELL spent the funds on personal expenses.

52.     On or about November 17, 2014, the Company President authorized and signed a Company check payable to DEQUATTRO to reimburse DEQUATTRO for his third $10,000 bribe payment to CROMWELL. The Company President processed the reimbursement as an employee

bonus check, and recorded it on the Company's books as a payroll expense, to conceal its true nature.

53.   On or about November 19, 2014, DEQUATTRO deposited the "bonus" check into his savings account to reimburse himself for paying the third $10,000 bribe to CROMWELL.

*The Fourth $10,000 Check*

54.   On or before January 6, 2015, approximately one month after opening the bank account for One Nation Development, CROMWELL asked DEQUATTRO for another $10,000.

55.   On or about January 6, 2015, DEQUATTRO wrote a personal check for $10,000 payable to CM International.

56.   On or about January 6, 2015, Friend A, acting at CROMWELL's direction, deposited DEQUATTRO's check into a CM International bank account.

57.   On or about January 6, 2015, Friend A, acting at CROMWELL's direction, bought a treasurer's check for $10,000 payable to One Nation Development.

58.   On or about January 6, 2015, CROMWELL deposited the $10,000 treasurer's check into the One Nation Development account. CROMWELL spent the funds on personal expenses.

59.   On or about February 18, 2015, the Company President authorized and signed a Company check payable to DEQUATTRO to reimburse DEQUATTRO for his fourth $10,000 bribe payment to CROMWELL. The Company President processed the reimbursement as an employee bonus check, and recorded it on the Company's books as a payroll expense, to conceal its true nature.

11

60.     On or about February 19, 2015, DEQUATTRO deposited the "bonus" check into his savings account to reimburse himself for paying the fourth $10,000 bribe to CROMWELL.

61.     On or about March 27, 2015, CROMWELL signed Gaming Authority check no. 51544 payable to the Company for $179,838.42 invoiced under the Contract.

*The Fifth $10,000 Check*

62.     On or about November 12, 2015, CROMWELL sent DEQUATTRO an email, attaching an unsigned letter that was not on letterhead. It stated: "Dear Dave, One Development will use the $10,000.00 dollar donation for Political Action Committee food towards food, campaigns and elections. Regards, Cedric Cromwell, One Nation Development."

63.     On or about November 13, 2015, DEQUATTRO wrote a personal check for $10,000 payable to One Nation Development.

64.     On or about November 14, 2015, CROMWELL negotiated the check, depositing $9,500 into the One Nation Development account and withdrawing $500 in cash.

65.     On or about November 16, 2015, the Company President authorized a Company payment to reimburse DEQUATTRO for his fifth $10,000 bribe payment to CROMWELL. The Company President processed the reimbursement as a single-paycheck salary increase, and recorded it on the Company's books as a payroll expense, to conceal its true nature.

66.     On or about November 18, 2015, the artificially increased paycheck was direct-deposited into DEQUATTRO's checking account to reimburse him for his fifth $10,000 bribe payment to CROMWELL.

67.     On or about January 29, 2016, CROMWELL cosigned Gaming Authority check no. 52001 to the Company for $324,387.01 invoiced under the Contract.

68.     On or about April 22, 2016, CROMWELL cosigned Gaming Authority check no. 52160 to the Company for $126,355.77 invoiced under the Contract.

69.     On or about May 20, 2016, CROMWELL cosigned Gaming Authority check no. 52234 to the Company for $184,858.87 invoiced under the Contract.

70.     On or about June 24, 2016, CROMWELL cosigned Gaming Authority check no. 52309 to the Company for $127,002.05 invoiced under the Contract.

*The Bowflex Revolution Home Gym*

71.     On or before August 2, 2016, CROMWELL asked DEQUATTRO for exercise equipment for CROMWELL's personal use. DEQUATTRO told the Company President about CROMWELL's request.

72.     On or about August 2, 2016, the Company President responded to a Craigslist post advertising the sale of a used Bowflex Revolution home gym, with free delivery.

73.     On or about August 3, 2016, the Company President emailed the seller to arrange for purchase of the Bowflex Revolution, to be delivered to CROMWELL's home in Attleboro, Massachusetts.

74.     On or about August 5, 2016, the seller delivered the Bowflex Revolution to CROMWELL's home. DEQUATTRO met the seller there and paid him $1,700 cash. The Company President reimbursed DEQUATTRO for half the price.

75.     On or about August 5, 2016, CROMWELL cosigned Gaming Authority check no. 52411 to the Company for $122,772.77 invoiced under the Contract.

76.     On or about September 9, 2016, CROMWELL cosigned Gaming Authority check no. 52485 to the Company for $166,500.21 invoiced under the Contract.

77.     On or about October 7, 2016, CROMWELL cosigned Gaming Authority check no. 52534 to the Company for $292,955.32 invoiced under the Contract.

78.     On or about November 18, 2016, CROMWELL cosigned Gaming Authority check no. 52582 to the Company for $84,401.00 invoiced under the Contract.

*The Sixth Check*

79.     On or about December 23, 2016, a friend of CROMWELL's who worked as the Gaming Authority's Program Manager ("Friend B"), acting at CROMWELL's direction, texted DEQUATTRO: "Below is the name of the pizza place in case you need it for the fundraiser[:] Barnstable pizza and pasta co inc . . . ."

80.     On or about January 3, 2017, Friend B, acting at CROMWELL's direction, texted DEQUATTRO: "Another option is the [sic] cut the check to the following Company[:] CM International LLC . . . . Note: Chairman Cedric Cromwell Campaign. Either way let me know by end of day by phone."

81.     On or about January 12, 2017, DEQUATTRO wrote a personal check for $4,000 payable to CM International.

82.     On or about January 17, 2017, Friend A, acting at CROMWELL's direction, deposited DEQUATTRO's check into a CM International account and withdrew $4,000 in cash.

83.     On or about January 17, 2017, the Company President authorized a payment to reimburse DEQUATTRO for his $4,000 bribe payment to CROMWELL. The Company President processed the reimbursement as an employee bonus payment rolled into DEQUATTRO's weekly paycheck, and recorded it on the Company's books as a payroll expense, to conceal its true nature.

14

84.     On or about January 18, 2017, the artificially increased paycheck was direct-deposited into DEQUATTRO's checking account to reimburse him for his $4,000 bribe payment to CROMWELL.

85.     On or about January 20, 2017, CROMWELL cosigned Gaming Authority check no. 52680 to the Company for $215,583.03 invoiced under the Contract.

86.     On or about March 31, 2017, CROMWELL cosigned Gaming Authority check no. 52756 to the Company for $71,772.89 invoiced under the Contract.

*CROMWELL's Birthday Weekend at the Seaport Boston Hotel*

87.     On or about May 15, 2017, CROMWELL texted DEQUATTRO: "Hello Dave. I hope all is well. My Birthday is coming up this Friday May 19th and I wanted to spend Friday through Monday at a very nice hotel in Boston on for my Birthday weekend. Is it possible that you can get me a nice hotel room at the Four Seasons or a suite at the Seaport Hotel? I am going to have a special guest with me. Please let me know and Thank You."

88.     On or about May 15, 2017, DEQUATTRO texted CROMWELL's message to the Company President, adding "Guess who" and "u can't think of this stuff.......what is next?"

89.     On or about May 17, 2017, the Seaport Boston Hotel sent an email to DEQUATTRO confirming a reservation for CROMWELL for May 19-22, 2017, room type "Executive Suite King – Harbor View," listing a nightly room rate of $530 for May 19, $548 for May 20, and $530 for May 21.

90.     On or about May 18, 2017, DEQUATTRO used the Company's credit card to pay $1,849.37 of the Seaport Boston Hotel invoice totaling $2,467.17, which included expenses for valet parking, room service breakfast and dinner, and a tab at the hotel's Tamo Lounge.

91.     On or about May 26, 2017, CROMWELL cosigned Gaming Authority check no. 52813 to the Company for $156,908.84 invoiced under the Contract.

92.     On or about May 26, 2017, CROMWELL cosigned Gaming Authority check no. 52847 to the Company for $140,147.29 invoiced under the Contract.

93.     On or about August 18, 2017, CROMWELL cosigned Gaming Authority check no. 52968 to the Company for $74,816.87 invoiced under the Contract.

CROMWELL's Unreported Income

*Income from the Carbon Offsets Company*

94.     In 2011-2012, a lawyer who became a business associate of CROMWELL's (the "Business Associate") formed two limited partnerships under Delaware law, "P-Co." and "P-Co. Shell Company."

95.     In 2012, P-Co. entered into a "Consultant Agreement" with a company that develops and supplies forest carbon offsets (the "Carbon Offsets Company"). [1] Under the Consultant Agreement, P-Co. agreed to: identify Native American tribes owning significant forest acreage; introduce such tribes to the Carbon Offsets Company and its business model; help negotiate carbon offset contracts between such tribes and the Carbon Offsets Company; and interface with the federal Bureau of Indian Affairs in support of those projects. The Consultant Agreement provided that the Carbon Offsets Company would pay P-Co. a "success fee" when

---

[1] Under California's cap-and-trade program, carbon-emitting companies must cap their emissions at a certain level. They may also buy a limited number of carbon-offset credits. One offset credit is currently equivalent to the removal of one metric ton of carbon dioxide from the atmosphere. Private owners of forest land who agree to maintain their forests, which reduce pollution because trees absorb carbon dioxide from the atmosphere, can sell carbon offsets through the California agency that regulates this program.

carbon offsets under a successful contract were monetized. In addition, the Carbon Offsets Company would pay P-Co.'s expenses. The Business Associate signed the Consultant Agreement on behalf of P-Co.

96.     Not later than April 2014, the Business Associate began submitting P-Co. expense reports to the Carbon Offsets Company. At the request of the Business Associate, the Carbon Offsets Company reimbursed the expenses with checks payable to the P-Co. Shell Company. The Business Associate deposited the checks into a bank account he had opened in the name of the P-Co. Shell Company for which he was the only authorized signatory (the "P-Co. Shell Company Account").

97.     In or about October 2014, the Business Associate submitted a P-Co. expense report to the Carbon Offsets Company seeking reimbursement for $5,000 incurred on October 1, 2014, for "consulting services for NCAI Conference," for which CROMWELL was identified as the vendor. The Business Associate asked the Carbon Offsets Company to pay the $5,000 by wiring the money to the P-Co. Shell Company Account.

98.     On or about October 23, 2014, the Carbon Offsets Company wired $5,000 to the P-Co. Shell Company Account. On the same day, the Business Associate bought a $5,000 official check, which identified the "remitter" as the P-Co. Shell Company, payable to Friend A.

99.     On or about October 24, 2014, acting at CROMWELL's direction, Friend A deposited the $5,000 official check into his personal bank account, and bought a $5,000 treasurer's check payable to CROMWELL.

100.    On or about October 24, 2014, CROMWELL deposited the $5,000 treasurer's check into a checking account he held jointly with his wife.

101.   The Business Associate communicated with the Carbon Offsets Company not only on behalf of P-Co., but also on behalf of a P-Co. affiliate incorporated in Canada ("P-Co. Canada").

102.   In 2016, the Carbon Offsets Company and P-Co. Canada entered into an "Amended and Restated Consultant Agreement" which said that it amended and restated the 2012 Consultant Agreement between the Carbon Offsets Company and P-Co. The Business Associate signed this agreement (the "2016 Amended Agreement") on behalf of P-Co. Canada.

103.   The 2016 Amended Agreement stated that P-Co. "either has engaged or intends to engage" three "Referral Agents," one of whom was CROMWELL, "in connection with the provision of" P-Co.'s consulting services.

104.   The 2016 Amended Agreement provided that the Carbon Offsets Company would pay each Referral Agent, through P-Co., $4,000 per month as an advance against any future success fee, with the total of such advances to all three Referral Agents not to exceed $72,000.

105.   In 2016, the Carbon Offsets Company wired the P-Co. Shell Company Account a total of $72,000, and issued a Form 1099 to the P-Co. Shell Company for this amount.

106.   On or about the following dates, the following amounts were wired from the P-Co. Shell Company Account to the One Nation Development bank account controlled by CROMWELL:

| Date | Amount |
|---|---|
| 02/26/16 | $2,000.00 |
| 03/14/16 | $4,000.00 |
| 03/31/16 | $4,000.00 |
| 05/03/16 | $4,000.00 |
| 06/03/16 | $4,000.00 |
| 07/13/16 | $3,536.00 |
| Total: | $21,536.00 |

18

107.    On or about the following dates, P-Co. Canada and/or P-Co. Shell Company wired the following amounts to the New Light Concepts bank account controlled by CROMWELL:

| Date | Amount |
|---|---|
| 01/11/17 | $32,315.20 |
| 03/22/17 | $4,000.00 |
| 04/28/17 | $3,990.00 |
| 05/17/17 | $3,990.00 |
| 06/07/17 | $3,990.00 |
| Total: | $48,285.20 |

108.    CROMWELL gave a sworn deposition in a civil lawsuit on December 3, 2018. When asked about P-Co., he testified: "I think they – to the best of my knowledge, they know the carbon sequestration market." When asked to define that term, CROMWELL answered: "It's about forestry management, about carbon offsets that forests provide based on carbon offenders. So there's a whole market out there, and I'm not that great at it. So I'm not an expert at that." When asked what he did for P-Co., CROMWELL testified: "You know, I knew a lot of people across Indian country, so I could make phone calls to them to introduce them to carbon sequestration." When asked about a $55,000 payment that he said he was expecting from P-Co. as of the date of the deposition, CROMWELL testified that P-Co. was "still trying to figure out" when he would receive the payment. When asked what he meant by that, CROMWELL answered: "It means when these carbon offsets are going to be sold, at what pricing and the California resource market. It's a bunch of gobbledygook at that point to me. I just want my money."

109.    CROMWELL did not report any of the income described in paragraphs 97-100 and 106-107 above, totaling approximately $74,821.20, to the IRS.

*Income from the CEO of the Firm that that Won*
*the Architect Contract for the First Light Casino Project*

110.    The Gaming Authority entered into an "Architect of Record Agreement for Architecture and Design Services" dated May 7, 2014, for an architecture firm based in Las Vegas, Nevada (the "Architecture Firm") to serve as the architect for the casino project.

111.    The CEO and controlling shareholder of the Architecture Firm was the only authorized signatory on a bank account held in the name of an investment holding company in Las Vegas (the "Investment Holding Company").

112.    On multiple occasions between December 2014 and January 2016, the Investment Holding Company wired money to a Florida limited partnership (the "Florida LP"), which wired money to the P-Co. Shell Company Account, which wired money to the One Nation Development account controlled by CROMWELL. Specifically:

| Date | From | To | Amount |
|---|---|---|---|
| 12/02/14 | Investment Holding Co. | Florida LP | $20,000.00 |
| 12/08/14 | Florida LP | P-Co. Shell Company | $11,500.00 |
| **12/08/14** | **P-Co. Shell Company** | **One Nation Development** | **$4,000.00** |
| 01/02/15 | Investment Holding Co. | Florida LP | $20,000.00 |
| 01/05/15 | Florida LP | P-Co. Shell Company | $11,500.00 |
| **01/05/15** | **P-Co. Shell Company** | **One Nation Development** | **$4,000.00** |
| 02/09/15 | Investment Holding Co. | Florida LP | $20,000.00 |
| 02/10/15 | Florida LP | P-Co. Shell Company | $11,500.00 |
| **02/10/15** | **P-Co. Shell Company** | **One Nation Development** | **$4,000.00** |
| 03/04/15 | Investment Holding Co. | Florida LP | $20,000.00 |
| 03/05/15 | Florida LP | P-Co. Shell Company | $11,500.00 |
| **03/05/15[2]** | **P-Co. Shell Company** | **One Nation Development** | **$4,000.00** |

---

[2] This payment was a treasurer's check dated March 5, 2015, for which P-Co. Shell Company was the "remitter." CROMWELL negotiated the check on or about March 13, 2015.

| Date | From | To | Amount |
|------|------|------|--------|
| 04/28/15 | Florida LP | P-Co. Shell Company | $4,000.00 |
| **04/29/15** | **P-Co. Shell Company** | **One Nation Development** | **$3,900.00** |
| 05/01/15 | Investment Holding Co. | Florida LP | $40,000.00 |
| 05/04/15 | Florida LP | P-Co. Shell Company | $11,500.00 |
| **05/04/15** | **P-Co. Shell Company** | **One Nation Development** | **$4,000.00** |
| 06/04/15 | Investment Holding Co. | Florida LP | $20,000.00 |
| 06/05/15 | Florida LP | P-Co. Shell Company | $9,000.00 |
| **06/05/15** | **P-Co. Shell Company** | **One Nation Development** | **$4,000.00** |
| 07/06/15 | Investment Holding Co. | Florida LP | $20,000.00 |
| 07/07/15 | Florida LP | P-Co. Shell Company | $5,000.00 |
| **07/08/15** | **P-Co. Shell Company** | **One Nation Development** | **$3,000.00** |
| **07/14/15** | **P-Co. Shell Company** | **One Nation Development** | **$1,622.27** |
| 08/06/15 | Investment Holding Co. | Florida LP | $20,000.00 |
| 08/07/15 | Florida LP | P-Co. Shell Company | $16,500.00 |
| **08/10/15** | **P-Co. Shell Company** | **One Nation Development** | **$4,000.00** |
| 09/04/15 | Investment Holding Co. | Florida LP | $20,000.00 |
| 09/04/15 | Florida LP | P-Co. Shell Company | $6,500.00 |
| 09/10/15 | Florida LP | P-Co. Shell Company | $4,000.00 |
| **09/22/15** | **P-Co. Shell Company** | **One Nation Development** | **$2,000.00** |
| 10/02/15 | Investment Holding Co. | Florida LP | $20,000.00 |
| 10/06/15 | Florida LP | P-Co. Shell Company | $10,500.00 |
| **10/06/15** | **P-Co. Shell Company** | **One Nation Development** | **$2,000.00** |
| **10/15/15** | **P-Co. Shell Company** | **One Nation Development** | **$852.31** |
| 01/05/16 | Investment Holding Co. | Florida LP | $20,000.00 |
| 01/06/16 | Florida LP | P-Co. Shell Company | $6,500.00 |
| **01/08/16** | **P-Co. Shell Company** | **One Nation Development** | **$1,648.49** |
| **01/29/16** | **P-Co. Shell Company** | **One Nation Development** | **$2,000.00** |
| | | **Total payments to One Nation Development:** | **$45,023.07** |

113.   CROMWELL did not report any of the income described in paragraph 112 above,

totaling $45,023.07, to the IRS.

*Additional Unreported Income - Bribes*

114.     CROMWELL did not report to the IRS any of the bribes paid to him by the Company through DeQuattro, including the six checks, the value of the Bowflex gym, or the value of the partly paid hotel stay, totaling approximately $57,549.37, as described in paragraphs 30-93 above.

*CROMWELL's Total Unreported Income*

115.     From 2014 through 2017, CROMWELL failed to report a total of approximately $176,193.64 in income to the IRS, as set forth below:

| | |
|---|---|
| 2014 | $39,000.00 |
| 2015 | $57,374.58 |
| 2016 | $26,884.49 |
| 2017 | $54,134.57 |
| Total: | $177,393.64 |

<u>COUNT ONE</u>
Conspiracy to Commit Federal Programs Bribery
(18 U.S.C. § 371)

The Grand Jury charges:

116.   The Grand Jury re-alleges and incorporates by reference paragraphs 1-115 of this Superseding Indictment.

117.   From on or about July 1, 2014, through on or about August 18, 2017, in the District of Massachusetts, and elsewhere, the defendants,

(1) CEDRIC CROMWELL and
(2) DAVID DEQUATTRO,

conspired with each other and with others known and unknown to the Grand Jury to commit offenses against the United States, to wit, violations of Title 18, United States Code, Sections 666(a)(1)(B) and (a)(2), that is:

a.   being an agent of an Indian tribal government, to corruptly solicit and demand for the benefit of any person, and accept and agree to accept, anything of value from any person, intending to be influenced and rewarded in connection with any business, transaction and series of transactions of such Indian tribal government involving anything of value of $5,000 or more, where such Indian tribal government received benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan guarantee, insurance or other form of Federal assistance in any one-year period; and

b.   to corruptly give, offer, and agree to give anything of value of to any person, with intent to influence and reward an agent of an Indian tribal government, in connection with any business, transaction and series of transactions of such Indian tribal government involving anything of value of $5,000 or more, where such Indian tribal government received benefits

23

in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan guarantee, insurance or other form of Federal assistance in any one-year period.

All in violation of Title 18, United States Code, Section 371.

COUNTS TWO-THREE
Bribery Concerning Programs Receiving Federal Funds; Aiding and Abetting
(18 U.S.C. § 666(a)(1)(B); 18 U.S.C. § 2)

The Grand Jury further charges:

118.   The Grand Jury re-alleges and incorporates by reference paragraphs 1-115 of this Superseding Indictment.

119.   On or about the following dates, in the District of Massachusetts, and elsewhere, the defendant,

CEDRIC CROMWELL,

being an agent of an Indian tribal government, or any agency thereof, namely, the Mashpee Wampanoag Tribe, corruptly solicited and demanded for the benefit of any person, and accepted and agreed to accept, anything of value from any person, intending to be influenced and rewarded in connection with any business, transaction and series of transactions of such tribal government involving anything of value of $5,000 or more, where such tribal government received benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan guarantee, insurance or other form of Federal assistance in any one-year period:

| Count | Transaction |
|-------|-------------|
| 2 | $10,000 bribe from the Company through DEQUATTRO on or about 11/13/15 |
| 3 | Bribes from the Company through DEQUATTRO of a Bowflex Revolution home gym valued at $1,700 on or about 8/5/16; $4,000 on or about 1/12/17; and $1,849.37 paid on or about 5/18/17 for a stay at the Seaport Boston Hotel |

All in violation of Title 18, United States Code, Sections 666(a)(1)(B) and 2.

COUNTS FOUR-FIVE
Bribery Concerning Programs Receiving Federal Funds; Aiding and Abetting
(18 U.S.C. § 666(a)(2); 18 U.S.C. § 2)

The Grand Jury further charges:

120.   The Grand Jury re-alleges and incorporates by reference paragraphs 1-115 of this Superseding Indictment.

121.   On or about the following dates, in the District of Massachusetts, and elsewhere, the defendant,

DAVID DEQUATTRO,

corruptly gave, offered, and agreed to give anything of value to any person, with intent to influence and reward an agent of an Indian tribal government, or any agency thereof, namely, the Mashpee Wampanoag Tribe, in connection with any business, transaction and series of transactions of such tribal government involving anything of value of $5,000 or more, where such tribal government received benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan guarantee, insurance or other form of Federal assistance in any one-year period:

| Count | Transaction |
|-------|-------------|
| 4 | $10,000 bribe from the Company to CROMWELL on or about 11/13/15 |
| 5 | Bribes from the Company to CROMWELL of a Bowflex Revolution home gym valued at $1,700 on or about 8/5/16; $4,000 on or about 1/12/17; and $1,849.37 paid on or about 5/18/17 for a stay at the Seaport Boston Hotel |

All in violation of Title 18, United States Code, Sections 666(a)(2) and 2.

## COUNT SIX
### Conspiracy to Commit Extortion
### (18 U.S.C. § 1951)

The Grand Jury further charges:

122.    The Grand Jury re-alleges and incorporates by reference paragraphs 1-115 of this Superseding Indictment.

123.    From on or about July 1, 2014, through on or about August 18, 2017, in the District of Massachusetts, and elsewhere, the defendant,

### CEDRIC CROMWELL,

conspired with others known and unknown to the Grand Jury to obstruct, delay, and affect, and attempt to obstruct, delay, and affect, in any way and degree, commerce and the movement of any article and commodity in commerce, by extortion, as that term is defined in Title 18, United States Code, section 1951; that is, by obtaining property not due to the defendant, from the Company, with the consent of DEQUATTRO and the Company President, under color of official right.

All in violation of Title 18, United States Code, Section 1951.

COUNTS SEVEN-TEN
Extortion
(18 U.S.C. § 1951)

The Grand Jury further charges:

124.    The Grand Jury re-alleges and incorporates by reference paragraphs 1-115 of this Superseding Indictment.

125.    On or about the following dates, in the District of Massachusetts, and elsewhere, the defendant,

CEDRIC CROMWELL,

did obstruct, delay and affect, and attempt to obstruct delay and affect, in any way and degree, commerce and the movement of any article and commodity in commerce, by extortion, as that term is defined in Title 18, United States Code, section 1951; that is, by obtaining property not due to the defendant, from the Company, with the consent of DEQUATTRO and the Company President, under color of official right:

| Count | Transaction |
|-------|-------------|
| 7 | $10,000 payment on or about 11/13/15 |
| 8 | Bowflex Revolution home gym valued at $1,700 on or about 8/5/16 |
| 9 | $4,000 payment on or about 1/12/17 |
| 10 | $1,849.37 payment on or about 5/18/17 for a stay at the Seaport Boston Hotel |

All in violation of Title 18, United States Code, Section 1951.

COUNTS ELEVEN-FOURTEEN
Filing False Tax Returns
(26 U.S.C. § 7206(1))

The Grand Jury further charges:

126.    The Grand Jury re-alleges and incorporates by reference paragraphs 1-115 of this Superseding Indictment.

127.    On or about the dates set forth below, in the District of Massachusetts, and elsewhere, the defendant,

CEDRIC CROMWELL,

did willfully make and subscribe a U.S. Individual Tax Return, Form 1040, for the calendar years set forth below, each of which was verified by a written declaration that it was made under penalties of perjury and was filed with the Internal Revenue Service, and each of which the defendant did not believe to be true and correct as to every material matter in that each return understated defendant's total income, as a result of which each return understated the amount of taxes due and owing for that year.

| Count | Calendar Year | Approximate Filing Date |
|-------|---------------|-------------------------|
| 11    | 2014          | 4/14/15                 |
| 12    | 2015          | 4/13/16                 |
| 13    | 2016          | 4/15/17                 |
| 14    | 2017          | 4/18/18                 |

All in violation of Title 26, United States Code, Section 7206(1).

29

## FORFEITURE ALLEGATION
### (18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

1.      Upon conviction of one or more of the offenses in violation Title 18, United States

Code, Sections 2, 371, 666, and 1951, set forth in Counts One through Ten, the defendants,

CEDRIC CROMWELL and
DAVID DEQUATTRO,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C),

and Title 28, United States Code, Section 2461(c), any property constituting, or derived from,

proceeds traceable to the offenses. The property to be forfeited includes, but is not limited to, the

following:

    a.   An amount to be determined as sentencing, to be entered in the form of a
       forfeiture money judgment.

2.      If any of the property described in Paragraph 1, above, as being forfeitable pursuant

to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section

2461(c), as a result of any act or omission of the defendants --

    a.   cannot be located upon the exercise of due diligence;

    b.   has been transferred or sold to, or deposited with, a third party;

    c.   has been placed beyond the jurisdiction of the Court;

    d.   has been substantially diminished in value; or

    e.   has been commingled with other property which cannot be divided without
       difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c),

incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property

of the defendants up to the value of the property described in Paragraph 1 above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

A TRUE BILL

_____
FOREPERSON

_____
CHRISTINE WICHERS
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF MASSACHUSETTS

District of Massachusetts: MARCH 22, 2021
Returned into the District Court by the Grand Jurors and filed.

_____ 3/22/21
DEPUTY CLERK

31